UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMETRICE DONTEA COATES,

               Petitioner,      Case No. 4:16-cv-11231

                               HON. TERRENCE G. BERG
v.

STEVEN RIVARD,

               Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR
WRIT OF HABEAS CORPUS, (2) DENYING A
CERTIFICATE OF APPEALABILITY, AND (3) GRANTING
PERMISSION TO APPEAL IN FORMA PAUPERIS**

This is a habeas case brought by a Michigan prisoner under 28 U.S.C. § 2254. Petitioner Demetrice Coates was convicted after a jury trial in the Kent County Circuit Court of first-degree home invasion, MICH. COMP. LAWS § 750.110a, interfering with an electronic communication, MICH. COMP. LAWS § 750.540, larceny from a building, MICH. COMP. LAWS § 750.360, and domestic assault, MICH. COMP. LAWS § 750.81. He was sentenced as a fourth-time habitual felony offender to 13 to 40 years for the home invasion conviction

and lesser concurrent terms for his other convictions.

The petition raises four claims: (1) ineffective assistance of counsel at trial, (2) error by the trial court in instructing the jury that it could convict Petitioner of larceny on the basis of his first break-in into the victim's apartment, (3) error by the state courts in failing to hold an evidentiary hearing on Petitioner's claims, and (4) Petitioner was convicted on the basis of false testimony by the victim. The Court denies the petition because Petitioner's claims are without merit. The Court also denies Petitioner a certificate of appealability, but grants permission to proceed on appeal in forma pauperis.

## I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> The victim and defendant were in a dating relationship that began in late December 2011 or January 2012 and ended sometime in February 2012. On the evening of March 18, 2012, defendant came to the victim's apartment and she permitted him to enter. When she subsequently refused to talk to defendant, he took two cellular telephones that did not belong to him, de-

spite the fact that she requested that he leave the telephones on her table. Defendant left her apartment with both telephones. The victim called 911 and told the responding officer that defendant had stolen two cellular telephones from her.

Defendant returned to the victim's apartment in the early morning hours of March 19, 2012. This time, the victim refused to allow defendant into her apartment. He then broke the victim's door frame, entered the apartment, and proceeded to choke the victim and pull her hair. While defendant was assaulting the victim, she attempted to call 911 on a third cellular telephone. However, defendant took this telephone away from her and left her apartment. The victim contacted the police from a friend's apartment and told the responding officers that defendant had broken down her door, assaulted her, and stolen her cellular telephone. The victim confirmed that defendant had not purchased any of the telephones that he took, that he was not a party to the service contracts for any of the telephones, and that she has not seen any of the three telephones since defendant took them. In addition, the victim testified that defendant was not a party to her lease and did not live at her apartment.

*People v. Coates*, No. 315913, 2014 WL 4792225, at *2 (Mich. Ct. App. Sept. 25, 2014).

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His brief on appeal raised the following claims:

I. Defendant's convictions for larceny in a building and interference with an electronic communication must be vacated because there is insufficient evidence to sustain beyond a reasonable doubt the conclusion that he committed the crimes charged.

II. Defendant's conviction for home invasion must be vacated due to insufficiency of the evidence that he did not have permission to be at the home.

Petitioner also filed a supplemental pro se brief that raised the following additional claims:

III. Whether trial counsel's performance throughout pre-trial and trial proceedings were so deficient as to deny defendant his constitutional right to effective assistance of counsel.

IV. Whether defendant's due process rights were violated when trial court allowed jury to deliberate on uncharged offense.

V. Whether defendant is actually innocent due to newly discovered evidence.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *Id*. Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court. The application raised only the three claims that were presented to the Michigan Court of Appeals in Petitioner's supplemental brief. The Michigan Supreme Court denied the application because it was

not persuaded that the questions presented should be reviewed by the Court. *People v. Walker*, 862 N.W.2d 192 (Mich. April 28, 2015) (table).

Petitioner then filed a motion for relief from judgment in the trial court, raising two new claims:

> I. Defendant was denied his constitutional right to the effective assistance of counsel based on (a) the failure to investigate evidence, and (b) the failure to call witnesses.

> II. Defendant was denied due process of law and his sentence is based on perjured testimony prejudicial to defendant and he was not allowed to challenge that information at trial.

The trial court denied the motion for relief from judgment because "this Court cannot grant relief on grounds that the Court of Appeals already decided against Mr. Coates because he has not established a retroactive change in the law. Additionally, even if Mr. Coates's purported 'new evidence' creates new grounds for relief, he had not demonstrated good cause for failing to present this evidence on appeal." Dkt. 11-10, at 2.

Petitioner then filed an application for leave to appeal in the Michigan Court of Appeals, raising the following claim:

I. Trial court made an error in its order denying Defendant's motion for relief from judgment based on (a) trial court failed to conduct evidentiary hearing, [and] (b) trial court failed to answer all issues raised under Defendant's motion for relief from judgment.

The Michigan Court of Appeals denied the application for leave to appeal because Coates "failed to establish that the trial court erred in denying the motion for relief from judgment." *People v. Coates*, No. 330432, Mich. Ct. App. Order (Jan. 29, 2016).

Petitioner did not appeal the Court of Appeal's decision to the Michigan Supreme Court. Dkt. 11-12 (affidavit of Michigan Supreme Court Clerk).

## II. Standard of Review

Section 2254(d) of Title 28 of the United States Code curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas corpus action if the claims were rejected on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court

and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

Demonstrating that a state court unreasonably applied clearly established Supreme Court law is no easy task because "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking

in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

A. Procedural Default

Respondent asserts that the Court may not review Petitioner's first, second, and fourth claims because of Petitioner's state court procedural defaults. Procedural default, however, is not a jurisdictional bar to review of a habeas petition on the merits. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the petitioner's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. The Court deems it more efficient to bypass the procedural default issue because Petitioner's claims are plainly without merit.

## B. Ineffective Assistance of Counsel

Petitioner's central claim is that he was denied effective assistance of trial counsel. Petitioner argues that his attorney failed to investigate and discover evidence showing that he had permission to be present at the victim's apartment on the date of the incident, evidence which could have negated an element of the home invasion charge. In support of this claim, Petitioner asserts he had a verbal agreement with the victim to remain in the apartment, and that he paid rent to stay there. He further claims that he had keys to the apartment and that he kept all of his belongings there. Petitioner asserts that this information should have been used to impeach the testimony of the victim that Petitioner did not have permission to be at her apartment at the time of the offense. He also contends that his counsel should have impeached the victim's credibility when she testified that she did not communicate with Petitioner since February 2012, when in fact text messages and a March 7, 2012 police report show that they communicated during the week leading up to the offense.

To establish ineffective assistance of counsel, a defendant must show both that: (1) counsel's performance was deficient, i.e., "that counsel's representation fell below an objective standard of

reasonableness"; and (2) the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Petitioner's argument rests on the assumption that the prosecutor was required to show that he did not have permission to be at the victim's apartment in order to prove that he was guilty of first-degree home invasion. This contention relies on a misinterpretation of the elements of first-degree home invasion. The home invasion statute states in relevant part:

> [A] person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is . . . present in . . . the dwelling, commits a[n] . . . assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling . . . [a]nother person is lawfully present in the dwelling.

10

MICH. COMP. LAWS § 750.110a(2). The Michigan Court of Appeals has held that the statutory provision, because it says "or," provides that this crime may be committed in two different ways: either "entering a dwelling without permission" OR "breaking and entering a dwelling." Only one of the two theories of guilt—"entering without permission,"—requires lack of permission. *People v. Schilling*, No. 270051, 2007 WL 2682980, at *3 (Mich. Ct. App. Sep. 13, 2007). A theory involving an allegation that a defendant "breaks and enters" a dwelling does not require proof of lack of permission. *Id.*

Petitioner's uncalled witnesses and the log of the text messages are evidence that could support a claim that, at certain points in time, Petitioner had permission to be at the victim's apartment or that he lived there. None of this evidence, which will be discussed in more detail below, indicates that Petitioner did *not* break and enter into the victim's apartment on the date of the offense. Indeed, the victim herself testified that earlier on the evening of March 18, 2012 she allowed Petitioner into her apartment. Dkt. 11-4 at 44. The crime occurred several hours later, when Petitioner kicked in the apartment door, assaulted the victim, and stole cell phones. None of Petitioner's proffered defense evidence undermines the

trial testimony that Petitioner committed first-degree home invasion by way of breaking and entering the apartment in the early morning hours of March 19, 2012.

Even setting aside the alternate theories of first-degree home invasion, defense counsel did not perform deficiently by failing to make use of any of the proffered evidence. Petitioner supports his claim with a letter (later turned into an affidavit) from Lynette Johnson that Petitioner lived with the victim in the house during the general time period of the offense. Dkt. 1, Appx. H; Dkt. 16. Another letter by Benjamin Coates, Petitioner's brother, also claims that Petitioner lived with the victim during the timeframe of the offense. *Id.* Jason Moore wrote a similar letter. *Id.* Finally, Petitioner points to a report of a police call to the victim's apartment occurring on March 7, 2012, Dkt. 1, Appx. E, and records of text messages between Petitioner and the victim. *Id.*, Appx. F.

While possibly probative of Petitioner's past relationship with the victim and her apartment, none of these materials contradict the evidence that Petitioner committed first-degree home invasion in the early morning hours of March 19 by breaking and entering. Johnson's affidavit vaguely claims "my testimony will show that Demetrice was living with [the victim] at the time since December after his tether was removed. . . ." Dkt. 16, at 1. Yet she goes on to

describe that Petitioner would leave for days after arguments, or that the victim would throw Petitioner's clothes out of the apartment. *Id*. Petitioner's brother also describes a tumultuous relationship where Petitioner sometimes stayed with the victim and sometimes did not, but he would "always end up back at home in [the victim's apartment]." Dkt. 1. Appx. H, Statement of Benjamin Coates. Similarly, Jason Moore states that despites fights Petitioner "would always end up going back home with [the victim] to work things out. . . ." *Id.*, Statement of Jason Moore.

The affidavits do not contradict the victim's testimony that she was in a dating relationship with Petitioner for a time, but that it had ended before the incident giving rise to the offenses. None of the three witnesses state that they would have been able to testify that Petitioner had permission to be at the victim's apartment on the date of the offense, or that he did not kick in her door. Police officer Kristen Rogers testified that Petitioner told her that he was living with his mother at a different location on the date of the offense. Dkt. 11-5 at 10. The government admitted photographs at trial purportedly showing the damage to the victim's door. Dkt. 11-4 at 89, 105.

Other materials Petitioner alleges his counsel should have used in his defense actually undermine his defense. The March 7,

2012 police report clearly indicates that at least by that date—a week before the offense—the victim had kicked Petitioner out of her apartment. Dkt. 1, Appx. E. On that date, the victim claimed that Petitioner only stayed with her "once in a while," and that she was kicking him out. The report indicates that police forced Petitioner to turn over his keys to the building and the victim's apartment to her at the scene. *Id*. The log of text messages from Petitioner's phone dated from about a week prior to the offense to the date before the offense, which will be discussed in more detail below, contains a number of messages in which Petitioner asks for permission to come over the victim's house. Dkt. 1, Ex. F. In other words, the text messages and police report demonstrate that Petitioner did not have, and did not believe that he had, a right to be in the apartment without her permission. They do not refute the evidence that he kicked in the door. Counsel did not perform deficiently by failing to make use of these witnesses, the police report, or the text messages, to support Petitioner's defense that he did not commit first-degree home invasion.

Petitioner also argues that some of these materials could have at least been used to impeach the credibility of the victim, if not for a substantive purpose. At trial, the victim described Petitioner as

her ex-boyfriend. Dkt. 11-4 at 39. She testified that she started dating him in December of 2011, and she stopping dating him in February of 2012. *Id.* at 40. She testified that the apartment at issue was hers, but she conceded that Petitioner sometimes stayed there. *Id.* at 41. Significantly, she denied that there were any communications, including text messages, between February of 2012, and the date of the offense. *Id.* at 42. The victim testified that she did not expect Petitioner to come over to her apartment on the date of the offense, but that he just "showed up." *Id.* at 43. These last two items are the only ones brought into question by the police report and log of text messages, and the Court discusses each below.

First, however, it is important to note that the victim also testified that when Petitioner knocked on her door on the evening of March 18, she let him in. *Id.* at 44. Petitioner wanted to talk to the victim, but she did not want to talk with him. *Id.* at 45. Petitioner became angry, took one of the victim's cell phones off of a table and left. *Id.* at 45–46. The victim called the police, they came to the scene, and she reported the theft of the phone. *Id.* at 48. Officers told the victim not to allow Petitioner back inside if he returned. *Id.* at 48. When Petitioner came back around 3:45 a.m. the next morning, he broke into the apartment by kicking in the door. *Id.* at 49–51. The victim identified a photo of her damaged doorframe from

the incident. *Id.* at 52–54. The victim then described the attack that resulted in his conviction. *Id.* at 54–60.

Technically, the police report could have been used to impeach the victim's testimony that she did not communicate with Petitioner between their February breakup and the offense. The March 7, 2012 report indicates that on that date police responded to a domestic incident at the victim's apartment where Petitioner and the victim were yelling at each other—the parties were "communicating" after February. Dkt. 1, Ex. E. The victim claimed that Petitioner owed her money, and Petitioner maintained that he did not. The parties yelled at each other and the officers were forced to separate them. The incident ended with Petitioner removing items belonging to him from the apartment and handing the keys to the building and apartment he had to the victim. *Id.*

While it is true that the victim testified that the relationship with Petitioner ended in February of 2012, she did not give an exact date, and the incident described in the police report does not convincingly contradict that testimony in a manner that would have benefited the defense. If anything, it shows that the relationship between the two at that time was acrimonious, and the information in it supported the victim's testimony that Petitioner did not live at

the apartment or have permission to be there at the time of the offense, which occurred about a week later. Indeed, the police forced Petitioner to give the keys to the building and apartment back to the victim. On the whole, the report arguably contains information that was more damaging to Petitioner's defense than helpful. Defense counsel's decision not to use the March 9 incident to impeach the victim's testimony concerning her having stopped communicating with Petitioner after February was a valid strategy to undertake in view of its damaging nature.

Petitioner also relies on the log of text messages that were purportedly sent and received between himself and the victim starting on March 13, 2012, and continuing to the date of the incident. Dkt. 1, Ex. F. The text messages clearly show that Petitioner and the victim were in communication, on generally friendly terms, during the time that the victim testified they were not. The gist of the messages indicate that starting on March 13, 2012 Petitioner had been reaching out to the victim in an effort see her by sending her multiple messages indicating he wanted "friendship." *Id.*, Message No. 20. The victim seemed to acquiesce to the request by responding, "Is [sic] that what u [sic] want then okay." *Id.*, No. 21. Eventually, on March 13, 2012, Petitioner asked if he could come over, and the victim responded that he could. *Id.*, Nos. 30–31. It's unclear

from the remaining messages whether Petitioner ever came over to the victim's apartment on that date. *Id.* Nos. 32–166. Many of the texts seem to indicate a change of heart or plans by either Petitioner or the victim. *Id.* While the existence of these messages certainly contradicts the victim's testimony that she did not communicate with Petitioner at all after February of 2012, they also support, rather than refute, the victim's assertion that Petitioner was not living at her apartment on the date of the offense and required permission to come over.

Finally, while it appears that Petitioner might have been invited over on the evening of March 18, 2012, see *Id.* at Nos. 137–162, the messages end there, and they do not speak at all to the violent incident that occurred hours later on March 19. At most, counsel could have impeached the victim's testimony that they did not talk after February and also that Petitioner came over uninvited on the evening of March 18. It is unclear how much weight the jury would give that evidence because the victim already conceded that she allowed Petitioner to enter when he first came over on the evening of March 18. Dkt. 11-4 at 44. The messages do not contradict the victim's testimony about what occurred during the second incident—when Petitioner broke down the door, assaulted her, and then stole the phones. Thus, while the text messages

clearly had impeachment value because they showed the victim did not tell the truth when she said she had no communication with the Petitioner between February 2012 and the date of the break-in, it is difficult to assess what kind of effect such impeachment would have had on the verdict in light of all the evidence. While it is possible that the result could have been affected by this impeachment, the standard is whether "there is a reasonable *probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). Here, the Court cannot conclude that effective use of this impeachment evidence would have created a reasonable probability of a different result at trial.

Accordingly, Petitioner has failed to demonstrate that his counsel was ineffective because he failed to call any of the three witnesses, or use the contents of the March 7, 2012 police report or the text messages. His counsel did not perform deficiently by failing to use any of the materials to support a defense to the home-invasion charge. Petitioner has not shown a reasonable probability that the result his trial would have been more favorable had his counsel used the contents of the text messages or police report to impeach the victim's testimony about breaking off communication with Petitioner in February. Petitioner's claim is therefore without merit.

C. Jury Instructions

Petitioner next claims that the trial court incorrectly instructed the jury that it could convict Petitioner of larceny from a building if it found he took *any* of the phones mentioned during the victim's testimony, when the charging documents only referred to the second part of the incident, occurring in the early morning hours of March 19, 2012, that involved the taking of additional phones.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const., Amend. VI. The Sixth Circuit has explained this right, as applied to the States through the Fourteenth Amendment, as follows:

> The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense. *In re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977). This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. *Combs v. Tennessee*, 530 F.2d [695, 698

(6th Cir. 1976)].

*Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984).

Here, the Michigan Court of Appeals reasonably and correctly found that Petitioner was put on adequate notice of the charges against him by the testimony elicited at the preliminary examination:

> At the preliminary examination, the victim testified that defendant stole two cellular telephones from her apartment on the evening of March 18, 2012 and that on the morning of March 19, 2012, defendant broke into her apartment, assaulted her, and stole a third cellular telephone from her. Further, defendant cross-examined the victim regarding all three telephones. . . . [T]he amended information, coupled with the preliminary examination, was constitutionally sufficient to put defendant on notice of the charges against which he was required to defend. *People v. Higuera*, 244 Mich. App. 429, 444 (2001). Therefore, we conclude that defendant was provided with sufficient notice that he would be defending against the charge of larceny in a building with regard to any of the three cellular telephones taken from the victim's apartment.

*Coates*, No. 315913, 2014 WL 4792225, at *5.

This decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. Although the charging document may have only referred to an incident occurring on March 19, 2012, in reality the two incidents occurred hours apart

and the evidence presented at the preliminary examination fairly put Petitioner on notice of the allegations he faced at trial. There is no indication in the trial record that Petitioner was surprised or unable to present a defense with respect to the victim's testimony regarding the either encounter with Petitioner. Petitioner has failed to demonstrate entitlement to habeas relief with respect to this claim.

D. Failure to Hold Evidentiary Hearing

Petitioner's next claim asserts that the state courts erred in failing to hold an evidentiary hearing on his claim of ineffective assistance of counsel. The state court's failure to hold an evidentiary hearing with respect to Petitioner's ineffective assistance of counsel claim is a matter of state law, which is not cognizable on federal habeas review. *See Litteral v. Palmer*, No. 08-cv-11172, 2010 WL 2633595, at *14 (E.D. Mich. Jun. 29, 2010) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)) (State law "does not confer an absolute right to an evidentiary hearing in all cases where a defendant alleges ineffective assistance of counsel, and the denial of a [] hearing is a matter of state law not cognizable on federal habeas corpus review."). Petitioner's claim that the state courts improperly refused his request for an evidentiary hearing is therefore not cognizable in this action.

E. False Testimony

Petitioner's last claim asserts that the testimony of the victim was false with respect to her relationship with Petitioner, what he did on the date of the offense, and whether he lived with her at the time of the offense. He argues that the victim's testimony is contradicted by the contents of the March 7, 2012, police report and the log of text messages.

The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). A prosecutor who allows false evidence or testimony to go uncorrected has thereby deprived a defendant of due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citations omitted). To succeed on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a criminal defendant must show that the statements were false and material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F. 3d 320, 343 (6th Cir. 1998). A habeas petitioner has a higher burden than a criminal defendant, however. *Byrd v. Collins*, 209 F.3d 486, 517–18 (6th Cir. 2000). A habeas petitioner must show that a witness's statement was "indisputably false," not merely misleading. *Id.*

23

Petitioner's claim fails because he has not shown that the prosecutor knew that the victim testified falsely at trial. See *Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009). Petitioner has presented nothing to show that the prosecutor was aware of the log of text messages. Nothing in the other materials suggests false testimony by the victim. This claim is wholly without merit.

None of Petitioner's proffered evidence demonstrates that he was denied the effective assistance of counsel. Even considering the contents of the uncalled defense witnesses' statements, the police report, and the log of text messages, Petitioner's claims of ineffective assistance of counsel and admission of perjured testimony are without merit.

## IV. Certificate of Appealability

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473,

483–84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). Here, jurists of reason would not debate whether the petition should have been resolved in a different manner because Petitioner's claims are devoid of merit. The Court will therefore deny a certificate of appealability. The Court will, however, grant permission to appeal in forma pauperis because an appeal of this decision can be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** Petitioner's pending motions, 3) **DENIES** a certificate of appealability, and 4) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:      August 29, 2018

## Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on August 29, 2018.

s/A. Chubb
Case Manager